| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| --- | --- |
| | SUPERIOR COURT DIVISION |
| BUNCOMBE COUNTY | FILE NO. 24 CVS ____ |

BUNCOMBE COUNTY, NORTH )
CAROLINA, )
)
        Plaintiff, )
)
v. )
)    **COMPLAINT**
HCA MANAGEMENT SERVICES )
LP; MH MASTER HOLDINGS, LLLP; )
MH MISSION HOSPITAL, LLLP; and )
MH HOSPITAL MANAGER, LLC, )
)
        Defendants. )

Plaintiff, Buncombe County, North Carolina, through counsel, brings this action complaining of Defendants, HCA Management Services LP, MH Master Holdings, LLLP, MH Mission Hospital, LLLP, and MH Hospital Manager, LLC (collectively "HCA") for quasi-contract, unjust enrichment and quantum meruit. In support, Plaintiff alleges as follows:

## INTRODUCTION AND SUMMARY

1. Since acquiring the nonprofit formerly regulated Mission hospital system in early 2019, HCA has operated Mission as a for-profit hospital and an unregulated monopoly. As part of its unlawful conduct, HCA has drastically cut staffing and labor and shut down or reduced entire departments of the formerly proud Mission system, all in the name of profit. Among other things, HCA has drastically cut staffing and support personnel for the Mission Hospital emergency department in Asheville (the "ER") to handle the flood of patients the ER receives. Meanwhile, HCA has taken other steps to inflate the number of patients flowing to that ER. As a result, the County's Emergency Medical Services ("EMS") crews on numerous occasions have been forced to wait for incredibly long delays (known as "curb times" or "wall times") before the

1

EMS crew can transfer the patients to the ER and go back to other urgent tasks. These time periods have been far longer and unconscionably longer than national averages and industry standards. HCA's abusive and unlawful conduct has caused HCA to be unjustly enriched because the County has conferred a benefit on HCA and it would be unjust for HCA to retain it. Specifically, by cutting its own staffing, HCA has shifted onto the County the burden of caring for and shepherding these patients for lengthy periods of time, waiting until the understaffed ER can take them in. County EMS personnel are acting as unpaid labor to help HCA care for patients until HCA is finally ready for them – far past the time when the labor cost should fall on HCA as the hospital ER that is involved.

2.     In addition to the lengthy "wall times," where EMS personnel must wait in their ambulances parked outside the ER, HCA has also forced County workers to provide the benefit of other labor to help HCA, even having to leave their vehicles to do so, but still without pay to the County. EMS personnel often must provide services for HCA at the ER such as (1) housekeeping work to ensure the patients are delivered to safe, clean and sanitary rooms; (2) orderly services to shift around existing ER patients so that ambulance patients can be admitted to a hospital room; and (3) continuing to treat patients in ambulances, in the waiting rooms, and in the hallways of the emergency room while waiting for the ER to receive the patients.

3.     The ER overcrowding at the root of the problem exists because the management of HCA refuses to staff and equip the Mission ER adequately and has decimated ER staffing and services just as with other departments of the formerly high-quality Mission non-profit system, such as oncology services. Overcrowding is enhanced by management admission policies which ensure the ER will be crowded but which enhance profits. These dire conditions have also led to the filing of a lawsuit by the North Carolina Attorney General against HCA alleging that HCA

2

Case 1:24-cv-00227-MR-WCM    Document 1-1    Filed 09/04/24    Page 2 of 19

has cut and decimated ER and other staffing and services so much as to rise to the level of a violation of special promises that HCA made in its original 2019 Asset Purchase Agreement with regard to maintaining the services and departments that the old, non-profit Mission once had. As the Attorney General's Complaint filed against HCA aptly states: "HCA has coopted paramedics as employees of its own, but stuck the taxpayers with the bill." *Joshua H. Stein, Attorney General, ex rel. Dogwood Health Trust, Plaintiff, vs. HCA Management Services, LP, et al.*, No. 23-CV-5013 (Buncombe County) ("*Stein v. HCA*"), *see* complaint dated Dec. 14, 2023, p. 6; and amended complaint dated April 26, 2024, p. 8 (attached as **Exhibit 1**).[1] Defendants have been unjustly enriched by these practices and the County is seeking restitution and disgorgement in this matter.

4. The *Stein v. HCA* complaint attached numerous affidavits reflecting the long wait times and deteriorating quality. Attached hereto as Exhibits 2 to 17 are copies of those affidavits, reflecting the circumstances. *See:*

    a. Affidavit of Van Taylor Jones dated Dec. 13, 2023, ¶¶ 4 (director for EMS for Buncombe County), 8-10 ("steady rise in the wait times"), 11-13 (EMS staff forced to assist patients inside the hospital) (**Exhibit 2**);

    b. Affidavit of Jamison Judd dated Dec. 14, 2023, ¶¶ 4 (EMS division manager for Buncombe County), 5-10 ("steady rise in wait times"), (**Exhibit 3**);

    c. Affidavit of Landon Miller dated Dec. 12, 2023, ¶¶ 3 (EMS coordinator for Fairview Fire Department), 8-9 ("significantly increased wait times at the

---

[1] The *Stein v. HCA* complaint alleges that HCA's conduct violated the terms of its asset purchase agreement in 2019 and seeks injunctive relief. Plaintiff previously filed a version of this complaint in the *Stein v. HCA* proceedings as a proposed intervenor complaint. However, on July 9, 2024, N.C. Business Court Judge Earp denied the motion to intervene, finding *inter alia* that discovery would take longer in the County's matter. Further, HCA denied that the Business Court was the appropriate venue. Accordingly, this matter is re-filed in the Buncombe County Superior Court and as a non-Business Court matter.

3

Emergency Department" and "HCA is relying on our paramedics to provide medical treatment to patients still waiting to be seen by Emergency Department medical staff."), 10-11 (same) (**Exhibit 4**);

d. Affidavit of Adrienne Rivera Jones dated Dec. 13, 2023, ¶¶ 3-18 (deputy EMS director for McDowell County; noting increase in turnaround time aka "wall time" after HCA took over) (**Exhibit 5**);

e. Affidavit of William Kehler dated Dec. 13, 2023, ¶¶ 3 (EMS director, McDowell County), 8 (wall times increased), 9-17 (long wait times, he complained to HCA managers) (**Exhibit 6**);

f. Affidavit of Catherine Owen dated Feb. 6, 2024, ¶¶ 4-10 (as patient she went to ER but had to wait 1 ½ hours with ambulance attendant), 11-19 (second poor ER experience), 20-32 (third poor experience), 33-29 (additional facts) (**Exhibit 7**);

g. Affidavit of Ryan Mayo dated Dec. 19, 2023, ¶¶ 4 (employed at Mission from 2015-2023), 9-13 (worsening quality, diminished care for patients who arrived by ambulance after HCA took over), 14-24 (understaffing; he complained to management) (**Exhibit 8**);

h. Affidavit of Tucker Richards dated Dec. 13, 2023, ¶¶ 3-4 (employed in ER as an RN), 5-9 (long waits due to inadequate staff), 10-18 (long waits, poor quality), 19-22 (complained to management) (**Exhibit 9**);

i. Affidavit of Mark Klein dated Dec. 13, 2023, ¶¶ 3 (RN at Mission), 14 (patient waited 30 hours in ER), 15-21 (lack of staff in ER) (**Exhibit 10**);

4

j. Affidavit of Mollie Franklin dated Jan. 25, 2024, ¶¶ 4-24 (patient experienced repeated long waits at ER) (**Exhibit 11**);

k. Affidavit of Laura Robbins dated Feb. 4, 2024, ¶¶ 6-32 (describing poor ER service to patient) (**Exhibit 12**);

l. Affidavit of Hannah Drummond dated Dec. 8, 2023 at ¶¶ 3-4 (RN in the ER), 8 (massive decline in staff), 20 (HCA not capable of providing adequate ER services) (**Exhibit 13**);

m. Affidavit of Edward Jenest dated Dec. 11, 2023 at ¶¶ 9 (reciting that ER wait time was in excess of six hours), 12-14 (poor ER conditions), 18 (ER excessive wait times) (**Exhibit 14**);

n. Affidavit of Korie Kennedy dated Feb. 5, 2024, ¶¶ 5-18 (reciting poor ER conditions leading to complaint to State) (**Exhibit 15**);

o. Affidavit of David Leader dated Dec. 12, 2023 at ¶¶ 5-13 (ER delays, inadequate staffing, which he experienced as a patient) (**Exhibit 16**);

p. Affidavit of Scott Joslin dated Dec. 12, 2023 at ¶¶ 5 (he was Mission hospitalist medical director through 2023), 14-28 (ER conditions), 32 (on any given night, there would be six to ten ambulances in the ambulance bays that were not even unloading, and "Mission was essentially cannibalizing the Buncombe County ambulance staff as unpaid workers who were having to continue taking care of their ED patients.") (**Exhibit 17**).

5. In addition to the filing of the Attorney General's complaint, both state and federal regulators have made extensive findings which support the claims of the County. For example, CMS detailed in a report dated December 2023 the decline in services in the ER and

the violations of the policies, laws and regulations to which the services are subject. *See* **Exhibit 18**, survey dated Dec. 19, 2023; **Exhibit 19,** Dec. 19, 2023 letter from NC DHHS to HCA.

6. Further, a February 1, 2024 letter from CMS to HCA described how on December 9, 2023, the North Carolina State Survey Agency concluded a complaint survey at Memorial Mission Hospital and Asheville Surgery Center. **(Exhibit 20)**. This survey found that the hospital was not in compliance with the Medicare Conditions of Participations and that the noncompliance posed an "immediate jeopardy to patients' health and safety." The hospital failed to meet Conditions of Participation including relevantly "42 C.F.R. § 482.55" governing "Emergency Services…." Deficiencies were further set out in subsequent correspondence. **(Exhibits 21-22)**.

## PARTIES, JURISDICTION, AND VENUE

7. The Plaintiff, Buncombe County, is a County established by N.C.G.S. § 153A-10 and as such is a public agency and body politic vested with the right to sue and be sued under N.C.G.S. § 153A-11 and the right to establish an EMS service for Buncombe County and surrounding counties. The creation of an EMS service is an essential service to be provided by North Carolina counties to their citizens. The County has established these services and staffs this department with EMS professionals qualified under N.C.G.S. § 131E-55 to provide emergency medical services. North Carolina statutes recognize that EMS ambulance services may charge for their services and establish liens for payment of their services. The County's Board of Commissioners has authorized this suit on its behalf.

8. Defendant HCA Management Services, LP, upon information and belief, is a Delaware limited partnership doing business in the State of North Carolina with a principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville,

Tennessee, and its North Carolina registered agent, CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina.

9. Defendant MH Master Holdings, LLLP, upon information and belief, is a Delaware limited liability limited partnership doing business in the State of North Carolina with a principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville TN 37203, it maintains a place of business at 509 Biltmore Avenue, Asheville, North Carolina, and its North Carolina registered agent, CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina.

10. Defendant MH Mission Hospital, LLLP, upon information and belief, is a Delaware limited liability limited partnership doing business in the State of North Carolina with a principal place of business in Nashville, Tennessee. Its principal office address is One Park Plaza, Nashville TN 37203, it maintains a place of business at 509 Biltmore Avenue, Asheville, North Carolina, and its North Carolina registered agent, CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh, North Carolina.

11. Defendant MH Hospital Manager, LLC, upon information and belief, is a Delaware limited liability company, doing business in the State of North Carolina with a principal place of business in Nashville, Tennessee. It maintains a place of business at 509 Biltmore Avenue, Asheville, North Carolina. Its registered agent, c/o CT Corporation System, is located at 160 Mine Lake Court, Suite 200, Raleigh NC.

12. Upon information and belief, Defendants HCA Management Services, LP, MH Master Holdings, LLLP, MH Mission Hospital, LLLP, and MH Hospital Manager, LLC are all subsidiaries of HCA Healthcare, Inc.

13. This Court has personal jurisdiction over Defendants because they have transacted business in the State relevant to this action.

14. The Court has subject matter jurisdiction over this dispute and venue is proper in Buncombe County, North Carolina, under N.C.G.S. § 1-82.

## FACTUAL ALLEGATIONS

15. Each County of the State of North Carolina is required, and at all times relevant hereto, has been required, to establish and to maintain, 24 hours a day and seven days a week, a coordinated arrangement of local resources, including emergency medical services (EMS), under the authority of the County government organized to respond to medical emergencies. *See, e.g.,* 10A NCAC 13P .0201.

16. Plaintiff has established, and at all times relevant hereto has maintained, at its expense, personnel, equipment, and vehicles (collectively, Buncombe County EMS or "BCEMS") for the purpose of providing cost effective, efficient, and professional emergency medical services to the residents of Buncombe County 24 hours a day, seven days a week.

17. For the past five years, the County has employed approximately 160 EMS paramedics to staff its EMS services, not counting firefighters who also serve as paramedics. All these employees transport patients to the Mission ER. This service is paid for by a combination of fees-for-service and taxpayer dollars. BCEMS expects to be paid for the services of its personnel who also expect to be paid wages and benefits for their work. The services of the EMS paramedics have value and those who use their services expect to pay for these services. During some or all of the pertinent times, the County received no additional fees-for-service resulting from excessive wait times at the Mission ER but paid all such costs itself.

8

18. As alleged in the Attorney General's complaint in the *Stein v. HCA* action, as amended (attached as Ex. 1), since HCA's acquisition of the Mission system, and as a direct result of Defendants' profit-focused choices regarding the staffing and operation of Mission's emergency department, wait times experienced by BCEMS crews at Mission Hospital have become excessively long. In light of the obvious risk to patient safety, what is excessive is also unconscionable. *See* Exs. 2-17, including affidavits of nurses, physicians and patients describing understaffing and wait times, and affidavits of EMS personnel regarding the same.

19. In 2019, the non-profit Mission Hospital system was purchased by HCA, which effected a change in the legal status of the system from nonprofit to profit. At the time of purchase, the Mission Hospital system consisted *inter alia* of Mission Hospital-Asheville and five smaller satellite hospitals: Angel Medical Center in Franklin, N.C. Blue Ridge Regional Hospital in Spruce Pine, Highlands-Cashiers Hospital in Highlands, Mission Hospital McDowell in Marion and Transylvania Regional Hospital, in Brevard. Each of these smaller, satellite hospitals had at the time of purchase an emergency department smaller than the Mission ER. The network also included numerous other infrastructure and facilities contributing to the potential ability of HCA to abuse its monopoly power it concedes that it has over the region.

20. The Mission ER has approximately 94 beds. In 2020 Medicare.gov in listing Mission Memorial and Asheville Surgery Center noted Mission ER had more than 60,000 patients annually. Other sources for 2023 reported that the Mission ER had over 104,301 patient visits. Regardless of the actual number, the public data reflects a significant ER volume.

21. Prior to 2019, the process for transfers from other hospitals to Mission Hospital-Asheville was for physicians from the hospitals involved to communicate and to make a joint discretional decision on whether to transfer a given patient from one hospital to the other. If a

9

transfer to Mission Hospital-Asheville was warranted, the patient would typically be directly admitted to a Mission Hospital-Asheville normal inpatient bed.

22. However, with HCA, transfers now are directed to a "transfer center" where the decision on whether to transfer is made by a nonphysician. Furthermore, no physician can subsequently revoke that decision. The majority of patients transferred to Mission Hospital-Asheville are routed through the Mission ER. This procedure adds to Defendants' profits but contributes to excessive patient wait times at the ER.

23. In recent years Defendants have sought to increase the number of patients who initially present at an emergency department at one of the satellite hospitals and then transfer from the satellite hospital to the Mission ER. After taking over the Mission system, HCA changed the prior policy under which incoming transfers could go directly to a Mission Hospital-Asheville inpatient bed. Rather, under HCA's new policy, the majority of all incoming transfers must enter the ER. This policy of unnecessary ER admission as a prerequisite to inpatient admission is often accompanied by redundant doubling of medically unnecessary charges and overcrowding of the ER. However, the policy enhances the ER as a profit center and keeps patient volumes at the ER high. This policy continues to the present time. Further, two emergency medicine physicians well-respected in the community practicing at the ER have stated that HCA has forced incoming Mission Asheville patients to go through the ER in order to have an inpatient bed, further inflating wait times.[2]

24. Buncombe County maintains ambulance transfer records electronically in a database. From this database, the County can readily calculate for each ambulance trip the time the transport of a patient begins until it ends at sign-off by Mission ER nurse.

---

[2] *Ramming and Lalor v. HCA Healthcare, Inc.*, 3:22-cv-278-MOC-SCR (W.D.N.C.).

25. Based upon the compilation of these documents, BCEMS can calculate waiting periods of each patient and groups of patients over time. It is feasible to generate relevant data in graphical and spreadsheet form and to compile a compendium of recent graphs for wait times, which the County possesses.

26. For example, and without limitation, BCEMS's average wait time, also known as the "wall time," at the Mission ER during the pertinent times increased from approximately 9:41 minutes in the first quarter of 2020 to 17:41 minutes in the third quarter of 2023. Concurrently, "90th percentile times"—the time in which 90% of EMS-to-ER patient transfers occur—increased from approximately 16 minutes to over 32 minutes. These 90th percentile times far exceeded the 20-minute national standard reported by the National Emergency Medical Services Information System.

27. In 2018, the year before HCA acquired Mission, approximately 96% of ER patient handoffs occurred within 20 minutes. In contrast, by third quarter 2023, the rate of transfers within the 20-minute benchmark had dropped to approximately 72%.

28. These dramatic increases in wait times occurred in the face of numerous demands and complaints made by Plaintiff beginning in about 2019 to HCA, and despite the efforts of BCEMS crews themselves (a) to move and to offload ER patients to expedite transfer of care, and (b) to clean and to prepare Mission's vacant ER rooms for emergency care patients, actions which pull BCEMS supervisors and crews from the field and from being able to respond to EMS system needs.

29. In deliberately relying on BCEMS to treat Mission's ER patients rather than adequately staffing the Mission ER, Defendants have violated federal law, including the Emergency Medical Treatment & Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, and associated

11

rules and regulations. EMTALA requires the ER to provide a patient with an appropriate and timely medical screening examination and stabilizing treatment. Once an individual presents on hospital property[3] with a potential emergency medical condition, the hospital is responsible for care of the patient.

30. The Centers for Medicare and Medicaid Services ("CMS"), which is responsible for enforcement of EMTALA, states in its guidelines:

> Hospitals that deliberately delay moving an individual from an EMS stretcher to an emergency department bed do not thereby delay the point in time at which their EMTALA obligation begins. Furthermore, such a practice of "parking" patients arriving via EMS, refusing to release EMS equipment or personnel, jeopardizes patient health and adversely impacts the ability of the EMS personnel to provide emergency response services to the rest of the community. Hospitals that "park" patients may also find themselves in violation of 42 CFR 482.55, the Hospital Condition of Participation for Emergency Services, which requires that hospitals meet the emergency needs of patients in accordance with acceptable standards of practice.

CMS State Operations Manual, Appendix V, § 489.24(a)(1)(i), p 38.

31. CMS admonishes hospitals that parking ER patients "may result in a violation of [EMTALA] and raises serious concerns for patient care and the provision of emergency services in the community. CMS memo dated July 13, 2006, Ref: S&C-06-21, entitled "'Parking' of Emergency Medical Service Patients in Hospitals."

---

[3] EMTALA's requirements apply to the physical area immediately adjacent to a hospital's main buildings, other areas and structures that are not strictly contiguous to the main buildings but are located within 250 yards of the main buildings, and the parking lot, sidewalk, and driveway. 42 CFR §§ 413.65(a)(2), 489.24(b). *See* CMS State Operations Manual Appendix V – Interpretive Guidelines – Responsibilities of Medicare Participating Hospitals in Emergency Cases (Rev. 191, 7/19/2019); CMS letter to State Survey Directors, "EMTALA Issues Related to Emergency Transport Services" (Apr. 27, 2007). EMTALA's protections have been held to extend to private ambulances en route to the hospital's emergency department. *Arrington v. Wong*, 237 F.3d 1066, 1071-73 (9th Cir. 2001).

32. Further, pursuant to 42 CFR § 482.55, "[t]here must be adequate medical and nursing personnel qualified in emergency care to meet the written emergency procedures and needs anticipated by the facility."

33. From about November 13, 2023 through December 9, 2023, the N.C. Department of Health and Human Services ("NCDHHS") conducted a complaint investigation "to evaluate Mission hospital's compliance with Medicare Conditions of Participation." NCDHHS's 384-page report resulted in a determination that patients' welfare was in immediate jeopardy. (Ex. 18). The report concluded that one of causes of the determination was based upon "Emergency Services" where the hospital "failed to ensure a safe environment for the delivery of care to emergency department patients by failing to accept patients on arrival to the emergency department resulting in delays or failure to triage assess, and implement orders." *Id.*, p. 1. The report details numerous case studies and record reviews to document this finding. *See, e.g., id.* at pp. 6 (Patient #6 was not triaged or assessed by hospital nursing staff until 2227 (2 hours 45 minutes after arrival by EMS). There was a delay in accepting the patient and a delay in triage, assessment, and monitoring by nursing staff."), 7 ("Nursing staff failed to accept the patient upon arrival to the ED, resulting in delayed triage, care, and treatment."), 11 ("Nursing staff failed to provide care to emergency department (ED) patients by failing to triage upon arrival, assess, monitor, and provide care and treatment as ordered for 11 of 35 ED records reviewed….").

34. The report details specific patient examples that reflect how the excessive wait times imposed on the County EMS personnel are also imposed above all on the patients and on the members of the public who often without a choice and in physical pain are brought to the ER for service. The effect of the excessive wait times is to further jeopardize patient service level

13

quality and safety. For this reason as well as others, the County is justified in expecting HCA to ensure minimal wait times and to strictly comply with its service obligations.

35. Defendants' failures to comply with 42 C.F.R. § 482.55 was among the deficiencies cited in CMS's "immediate jeopardy" pronouncements to Defendants and poor survey results. (Exs. 18-22).

36. Only after (a) the County complained repeatedly as did others, (b) the N.C. Attorney General filed the above-captioned action, and (c) the NCDHHS recommended Mission Hospital be put in "immediate jeopardy," did Defendants begin to take action to adequately staff its ER rather than deliberately relying on BCEMS to treat Mission's ER patients. To date in 2024, and to be continued by HCA for an unknown period, and only occurring as a result of the above governmental action, Defendants have for the moment caused wall times at the Mission ER to decrease significantly so that the rate of transfers within the 20-minute benchmark is at approximately 93%.

37. Defendants, since HCA's acquisition of the Mission system, have unlawfully shirked their contractual, statutory, regulatory, and common law obligations by parking patients with BCEMS and effectively requiring BCEMS to wait in the hallway or in the parking lot with ER patients.

38. As a result of Defendants' "parking" of Mission ER patients with BCEMS for more than 20 minutes, Buncombe County taxpayers have provided a benefit to HCA of more than $3 million since the beginning of 2020.

39. By a properly directed demand letter, Plaintiff previously made demand on Defendant to reimburse Plaintiff for the expenses and damages incurred as a result of its actions. The Plaintiff did not receive a reply.

14

40. The unjust nature of HCA's unjust enrichment herein is highlighted by the fact that as an unregulated and conceded monopoly in the markets for inpatient and outpatient services and the geographic markets of Buncombe County and elsewhere in Western North Carolina, HCA has the ability to raise, or decrease, its quality of service, free of normal competitive pressures found in a free market. While the existence of a monopoly itself may not be illegal, the willful abuse of a monopoly position is. Here, HCA during the pertinent times had the ability to substantially increase service quality at Mission Asheville, or to decrease it, and willfully chose the latter route, which conduct constitutes unlawful monopoly maintenance and a further basis for a finding of unjust enrichment.

## FIRST CAUSE OF ACTION
### (Unjust Enrichment, Quantum Meruit, Restitution and Disgorgement)

41. All of the above paragraphs 1 through 40 of the Complaint are incorporated herein by reference.

42. During the pertinent times, the County rendered services to the Defendants under the aforesaid conditions such that the Defendants should be required to pay for them.

43. These services had significant value to the Defendants.

44. As described in the factual allegations hereinabove, during the pertinent times, the County rendered services to the Emergency Department at Mission Hospital and to Defendants by providing patient attendance and supervision services, housekeeping services, medical services and orderly services to the staff administering the hospital because the staff was overwhelmed at various times over the past four years and further.

45. At the time the services were rendered and continuing until today, the County expected to be paid when it renders a service. The services herein described were not a gift nor were they provided in repayment of or satisfaction of a debt.

46. Buncombe County's expectation of payment is reasonable.

47. The staff and employees of the Defendants requested the help of Buncombe County employees with express knowledge or reason to know that Buncombe County under the circumstances would expect to be paid under the circumstances and given the equities. A person has reason to know when the circumstances existing at the time are such that a reasonable person at the time would have acquired knowledge of it.

48. The Defendants, through their ER staff and others voluntarily accepted the services after having a realistic opportunity to refuse them.

49. HCA during the pertinent times was aware of the staffing cuts it was imposing and was aware of the effects those cuts were having. HCA had corporate knowledge of the inflated wait times and of the fact that the labor cost had been unlawfully moved over from HCA's own staff to the County's EMS staff. HCA knowingly and voluntarily accepted the benefits conferred by the Plaintiff and was thereby unjustly enriched.

50. As a result of Defendants' unlawful and unjust conduct, Plaintiff has rendered services to the Defendants; the services were knowingly and voluntarily accepted; and the services were not given gratuitously.

51. The Defendants' actions, as described herein, are unconscionable and unlawful. Defendants have received money which belongs to Plaintiff and which in equity and good conscience Defendants ought to pay and disgorge to Plaintiff, along with interest.

52. Defendants have failed, despite demand, to reimburse Plaintiff for and/or to disgorge such property or benefits, resulting in injury to Plaintiff in excess of $25,000.00, and justifying remedies of disgorgement and restitution for unjust enrichment.

## JURY DEMAND

Plaintiff respectfully requests a trial by jury of all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays:

1. that the Court find in favor of and enter judgment in favor of the Plaintiff;

2. that the Court order and award the recovery of Plaintiff's losses and damages including both nominal, actual, and to the extent the evidence may support, exemplary damages and/or restitution and disgorgement;

3. that the Court award costs and attorney fees to the extent the law may allow;

4. that the Court award such other relief, including equitable, declaratory and injunctive relief, as may be deemed appropriate by the Court; and

5. for such other relief as the Court finds to be just and proper.

Respectfully submitted this the 6th day of August, 2024.

*/s/ Robert N. Hunter, Jr. by [signature]*
Robert N Hunter, Jr.
(N.C. Bar No. 5679)
John Bloss
(N.C. Bar No. 23947)
Higgins Benjamin, PLLC
301 N Elm Street, Suite 800
Greensboro, NC 27401
336-273-1600
Fax: 336-274-4650
rnhunterjr@greensborolaw.com
jbloss@greensborolaw.com

*/s/ Mona G. Wallace*
Mona L. Wallace
(N.C. Bar No. 09021)
John S. Hughes
(N.C. Bar No. 22126)
Olivia Smith
(N.C. Bar No. 58375)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
osmith@wallacegraham.com

*Attorneys for Plaintiff*

EXHIBITS:

1. *Joshua H. Stein, Attorney General, ex rel. Dogwood Health Trust, Plaintiff, vs. HCA Management Services, LP, et al.*, No. 23-CV-5013 (Buncombe County), amended complaint dated April 26, 2024.
2. Affidavit of Van Taylor Jones dated Dec. 13, 2023.
3. Affidavit of Jamison Judd dated Dec. 14, 2023.
4. Affidavit of Landon Miller dated Dec. 12, 2023.
5. Affidavit of Adrienne Rivera Jones dated Dec. 13, 2023.
6. Affidavit of William Kehler dated Dec. 13, 2023.
7. Affidavit of Catherine Owen dated Feb. 6, 2024.
8. Affidavit of Ryan Mayo dated Dec. 19, 2023.
9. Affidavit of Tucker Richards dated Dec. 13, 2023.
10. Affidavit of Mark Klein dated Dec. 13, 2023.
11. Affidavit of Mollie Franklin dated Jan. 25, 2024.
12. Affidavit of Laura Robbins dated Feb. 4, 2024.
13. Affidavit of Hannah Drummond dated Dec. 8, 2023.
14. Affidavit of Edward Jenest dated Dec. 11, 2023.
15. Affidavit of Korie Kennedy dated Feb. 5, 2024.
16. Affidavit of David Leader dated Dec. 12, 2023.
17. Affidavit of Scott Joslin dated Dec. 12, 2023.
18. DHHS, CMS, Survey dated Dec. 9, 2023
19. NC DHHS, letter dated Dec. 19, 2023.
20. DHHS, CMS, letter dated Feb. 1, 2024.
21. DHHS, CMS, letter dated March 8, 2024.
22. DHHS, CMS, letter dated March 14, 2024.