UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| Buncombe County, North Carolina, | |
| Plaintiff, | |
| v. | Action No.: No. 1:24-cv-227 |
| HCA Management Services, LP; MH Master Holdings, LLLP; MH Mission Hospital, LLLP; and MH Hospital Manager, LLC, | |
| Defendants. | |

### Plaintiff's Response to Defendants' Objections to Memorandum and Recommendation of United States Magistrate Judge

Plaintiff Buncombe County respectfully submits the following response to Defendants' Objection to Memorandum and Recommendation (ECF 8).

Plaintiff has an obligation to provide EMS services for its citizens, while Defendants have a duty to provide stabilizing care for the patients after Plaintiff transports them to the Mission Hospital Emergency Department (the "Mission ER"). However, Defendants, after purchasing Mission Hospital, deliberately understaffed the Mission ER so that Plaintiff's EMS ("BCEMS") personnel were compelled to perform medical and custodial services that Defendants should have been providing. Numerous demands to Mission from the County (as well as pleas from Defendants' own employees and the public)

to staff the Mission ER adequately went unremedied.

Defendants argue to this Court that they were entitled to exploit
Plaintiff's duty to its EMS patients for Defendants' own benefit and at
County taxpayers' expense without consequences. In that connection they
challenge the August 17, 2025 Memorandum and Recommendation of the
Honorable W. Carlton Metcalf, United States Magistrate Judge, on a single
ground: that "North Carolina courts have never recognized an overlapping-
duties exception and would not do so if given the chance." (ECF 8 p.8).
Defendants are mistaken on this question, as shown below.

## FACTUAL BACKGROUND[1]

Emergency departments are required by federal law, including 42
U.S.C. § 1395dd ("EMTALA") and associated rules and regulations, to provide
each ER patient with an appropriate and timely medical screening
examination and stabilizing treatment. Once an individual with an
emergency medical condition presents on hospital property—which includes
the parking lot, sidewalk, driveway, and areas and structures located within

---

[1] For purposes of Defendants' motion to dismiss under Rule 12(b)(6),
the factual allegations of the Complaint are taken as true and all reasonable
inferences therefrom are drawn in plaintiff's favor. *E.g., Semenova v. Md.
Transit Admin.,* 845 F.3d 564, 567 (4th Cir. 2017).

2

250 yards of the hospital's main buildings[2]—the hospital is responsible for the care of the patient. "Parking" patients arriving via EMS and refusing to release EMS equipment or personnel does not delay the point at which these obligations begin and, in fact, violates federal law. (*See* ECF 1-1 ¶¶ 29-32).

Plaintiff Buncombe County maintained at all relevant times personnel, equipment, and vehicles (collectively, "BCEMS"), to provide cost-effective, efficient, and professional ambulance services to the residents of Buncombe County 24 hours a day, seven days a week. (Complaint, ECF 1-1, ¶ 16). In the five years preceding the filing of this action, the County employed approximately 160 EMS paramedics, *inter alia*, to transport patients to the emergency department at Mission Hospital in Asheville (the "Mission ER"). BCECMS services are paid for by a combination of fees-for-service and taxpayer dollars. (*Id.* ¶ 17).

Prior to Defendants' acquisition of the previously nonprofit Mission Health system in early 2019, its nonprofit predecessor routinely received and treated patients to the Mission ER without delay. Since Defendants' acquisition they have implemented a business plan reducing emergency room

---

[2] *See* 42 C.F.R. §§ 413.65(a)(2), 489.24; CMS State Operations Manual Appendix V – Interpretive Guidelines – Responsibilities of Medicare Participating Hospitals in Emergency Cases (Rev. 191, 7/19/2019); CMS Letter to State Survey Directors, "EMTALA Issues Related to Emergency Transport Services" (Apr. 27, 2007).

3

staffing to maximize profits. In doing so they have ignored their statutory, contractual, and common-law obligations, allowing emergency services at the Mission ER to deteriorate. As a result, BCEMS crews have frequently experienced excessive wait times to transfer patients to the Mission ER, requiring EMS personnel to attend to emergency room patients and to provide medical services to them long after arriving at the Mission ER. (*Id.*, *e.g.,* ¶¶ 1-3, 26-36, 49).

As pled, the average wait time for BCEMS crews at the Mission ER increased from approximately 9:41 minutes in the first quarter of 2020 to 17:41 minutes in the third quarter of 2023. Concurrently, "90th percentile times"—the time in which 90% of EMS-to-ER patient transfers occur—increased from approximately 16 minutes to over 32 minutes. These 90th percentile times far exceed the 20-minute national standard reported by the National Emergency Medical Services Information System. (*Id.* ¶ 26).

The substantial increases in BCEMS wait times occurred despite numerous demands from the County beginning in about 2019, and notwithstanding the efforts of BCEMS personnel themselves (1) to move and to offload ER patients into examination rooms to expedite transfer of care, and (2) to clean and to prepare vacant ER rooms for emergency care patients, actions which pull BCEMS supervisors and crews from the field and leave

4

them unable to respond to EMS system needs. (*Id.* ¶ 28).[3]

The County has received no additional payment from any source for the excessive wait times and additional duties imposed at the Mission ER but to date has borne the additional expense itself. (*Id.* ¶ 17). As the N.C. Attorney General's Complaint filed against the Defendants aptly described the situation, "HCA has coopted paramedics as employees of its own, but stuck the taxpayers with the bill." (*See* Complaint Ex. 1, ECF 1-2, at 8).

Defendants continued to shirk their responsibility to emergency care patients at the expense of the County until:

(1)     the Attorney General filed a State court action against them on December 14, 2023 (*see* ECF 1-1 ¶ 3); and

(2)     the U.S. Centers for Medicare and Medicaid Services ("CMS"), on December 9, 2023, identified the Mission ER as a candidate for "immediate jeopardy" classification and, after an intensive investigation, issued notice that Mission Hospital was in "immediate jeopardy" of losing CMS funding due to its disregard of ER patients' health and safety.[4]

---

[3] Defendants concede that Plaintiff states a claim with respect to these matters. *See* Objection p.3 n1 ("[A]lmost none of this action can survive dismissal. We are content to litigate the vestigial claim for janitorial services on a more complete record").

[4] CMS's 384-page report detailed numerous horrific examples of Defendants' neglect of Mission ER patients, finding that at least three

Only after such action by the NCAG and CMS did Defendants begin to take action to adequately staff its ER rather than deliberately relying on BCEMS to treat Mission's ER patients.[5]

## STANDARD OF REVIEW

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Halscott Megaro, P.A. v. McCollum,* 66 F.4th 151, 157 (4th Cir. 2023) (citation, quotations omitted). In evaluating a Rule 12(b)(6) motion, the Court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to

---

patients died and numerous others were endangered at Mission Hospital in 2022 and 2023 following significant delays and lapses of care in the emergency department and other areas. CMS concluded, *inter alia*, that "the hospital nursing staff failed to ensure a safe environment for the delivery of care to emergency department patients by failing to accept patients on arrival to the emergency department resulting in delays or failure to triage, assess, and implement orders." The report is attached to the Complaint as Exhibit 19.

[5] In the months before this action was filed, as a result of the above-described governmental actions, Defendants caused EMS wait times at the Mission ER to decrease so that the rate of transfers within the 20-minute benchmark improved to approximately 93%. (ECF 1-1 ¶ 36). However, it is unknown how long that situation will continue and at any time Defendants may choose to revert to their prior practices, which both endanger patient safety and run up Plaintiff's costs.

6

relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 676-79 (2009). *See also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief."). This analysis is context-specific and requires the court to draw on its "judicial experience and common sense." *Riddick v. Barber*, 109 F.4th 639, 647 (4th Cir. 2024).

## ARGUMENT

Defendants in their Objection repeatedly refer to the parties' duties to as "overlapping." It is true that even when both sides are diligently performing their duties there is necessarily *some* overlap in the duties of EMS personnel and emergency room personnel in the process of handing off the patient, as the hospital's EMTALA obligation begins as soon as the patient arrives on hospital property. Plaintiff submits, however, that the parties' respective duties to a patient are better described as *consecutive*, with BCEMS's duties ending upon the handoff of the patient. The question for the finder of fact in this case is whether Defendants unreasonably delayed patient handoffs and "parked" patients in ambulances in the care of BCEMS personnel, in derogation of their duty to Mission ER patients[6] and at the

---

[6] *See* CMS Letter to State Survey Directors, "EMTALA – 'Parking' of Emergency Medical Service Patients in Hospitals" (July 13, 2006), https://ambulance.org/wp-content/uploads/2022/01/SCLetter06-21.pdf.

7

expense of Plaintiff.

Plaintiff does not quibble with the general proposition that a party cannot recover from another for actions it would otherwise be duty-bound to perform without any interference from the other. For example, Buncombe County would not have an actionable claim against Defendants merely for transporting patients to the Mission ER, even though delivering patients to the hospital provides a financial benefit to Defendants. But because Defendants have manipulated the County's obligations to its BCEMS patients, for Defendants' financial benefit and to the County's detriment, they subject themselves to unjust enrichment liability. In other words, to use the Fourth Circuit's terminology, when the defendant wields the plaintiff's independent obligation to another as a "sword"—to extract a benefit for itself—it should not be heard to use the same obligation as a "shield" to an unjust enrichment claim. *See Metric Constructors, Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,* 72 F. App'x 916, 923 (4th Cir. July 30, 2003). Here, the County's transportation of EMS patients to the Mission ER and associated care for those patients, as a general matter, is done in discharge of its obligations to them. However, the excessive wait times for which Plaintiff seeks restitution are the product of the Defendants' own wrongful actions. As

8

a result of their profit-motivated decision to understaff the Mission ER, Defendants have exploited the County's services for their own benefit, resulting in a windfall of millions of dollars to them.

Hospitals like Defendants' Mission Hospital that participate in the Medicare program and offer emergency medical services have a duty under EMTALA and associated rules and regulations to provide stabilizing medical treatment to emergency room patients. More generally, Defendants acknowledge that "all health care providers" have "statutory and common-law duties . . . to their patients—including the duty to provide care until it can safely be discontinued." (ECF 4-1 at 8 (citing, *e.g.*, *Willoughby v. Wilkins*, 65 N.C. App. 626, 644 (1983)).

The Restatement of Restitution addresses, *inter alia*, situations where one party performs another's duty to provide necessary care for a third person, in relevant part as follows:

### Performance of Another's Duty

(1) A person who performs another's duty to a third person . . . is entitled to restitution from the other as necessary to prevent unjust enrichment, if the circumstances justify the decision to intervene without request.

(2) Unrequested intervention may be justified in the following circumstances:
* * *
(b) the claimant may be justified in *performing another's duty to furnish necessaries to a third person, to avoid imminent harm to*

9

*the interests of the third person*[.]

RESTATEMENT (THIRD) RESTITUTION AND UNJUST ENRICHMENT § 22 (2011) (emphasis added).[7]

Section 35 of the Third Restatement—addressing the situation where one party to a contract demands that the other party "overperform" its duties—is also instructive here:

### Performance of Disputed Obligation

(1) If one party to a contract demands from the other a performance that is not in fact due by the terms of their agreement, under circumstances making it reasonable to accede to the demand rather than to insist on an immediate test of the disputed obligation, the party on whom the demand is made may render such performance under protest or with reservation of rights, preserving a claim in restitution to recover the value of the benefit conferred in excess of the recipient's contractual entitlement. . . .

Comment:

*a. General principles and scope; relation to other sections.* Where a valid contract defines the scope of the parties' respective performance obligations, a performance in excess of contractual requirements--neither gratuitous, nor pursuant to compromise--results in the unjustified enrichment of the recipient and a prima facie claim in restitution. Instances of contractual "overperformance," rectified by restitution in favor of the performing party, are most commonly described in terms of mistake or duress; though the lines between these categories

_____

[7] North Carolina courts have cited the Restatement of Restitution with approval in numerous cases, including *Embree Constr. Grp., Inc. v. Rafcor, Inc.,* 330 N.C. 487, 496, 411 S.E.2d 916, 923 (1992); *Smith v. Smith,* 334 N.C. 81, 92, 431 S.E.2d 196, 203 (1993); *Booe v. Shadrick,* 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988).

cannot always be clearly drawn.

RESTATEMENT (THIRD) RESTITUTION AND UNJUST ENRICHMENT § 22 (2011).

This provision illustrates that a party that is operating under a contract may

nevertheless recover for unjust enrichment when it overperforms its duties

under duress. Similarly, here, Defendants' dereliction of its duties

necessitated that Plaintiff overperform its duties to patients, and Plaintiff is

entitled to recover for the value of such overperformance.

Finally, a provision of the original 1937 version of the Restatement of

Restitution, which was quoted with approval by the North Carolina Supreme

Court in *Nationwide Mut. Ins. Co. v. Chantos*, 293 N.C. 431, 442, 238 S.E.2d

597, 605 (1977), provides as follows:

> A person who, in whole or in part, has discharged a duty
> which is owed by him, but, which as between himself and
> another, should have been discharged by the other, is entitled to
> indemnity from the other, unless the payor is barred by the
> wrongful nature of his act.

RESTATEMENT (FIRST) OF RESTITUTION § 76 (1937). The services at issue were

performed by BCEMS personnel because of duties owed to their patients, but

as between BCEMS and the Mission ER, should have been performed by

Mission ER.

Defendants assert that there is no exception in this State's

jurisprudence to the general rule that a party involved in the exercise of some

11

legal obligation cannot recover from another for unjust enrichment.

(Objection at 5). But Defendants need look no further than the law governing

their own emergency room to find exceptions to the general rule. The duty to

treat emergency room patients certainly does not prevent hospitals from

recovering *in quantum meruit* from those patients who cannot or do not sign

the hospital's consent agreement before being treated,[8] or from emergency

---

[8] *See Charlotte-Mecklenburg Hosp. Auth. v. Talford*, 214 N.C. App. 196, 213, 714 S.E.2d 476, 488 (2011), where the ER consent form signed by the patient "did not specify the amount to be charged to Defendant," the Court of Appeals concluded that the price term was indefinite, and "the outcome is . . . determined pursuant to a *quantum meruit* analysis." 214 N.C. App. at 211, 714 S.E.2d at 486-87. As a result, the hospital's measure of damages was "the reasonable value of the services provided to plaintiff" by the hospital. *Id.* at 196, 216 n.3, 714 S.E.2d 476, 489 n.3. The Court of Appeals concluded that there was a material issue of fact as to whether the charges were reasonable, and reversed summary judgment in favor of the hospital. On appeal, the Supreme Court reversed the Court of Appeals on the question of whether the hospital had established the reasonable value of its services. *Charlotte-Mecklenburg Hosp. Auth. v. Talford*, 366 N.C. 43, 49-50, 727 S.E.2d 866, 870-71 (2012). The Court held that the hospital's affidavit in that case was sufficient to establish that the billing was "within industry norms," and sufficient to meet the hospital's burden of establishing the reasonableness of the charges. *Id.* at 870-71. *See generally Forsyth Cty. Hosp. Auth., Inc. v. Sales*, 82 N.C. App. 265, 266, 346 S.E.2d 212, 214 (1986) ("[W]hen a physician renders professional services, the law implies a promise on the part of the patient who received the benefit of the services to pay what the services are reasonably worth, absent an agreement that the services were rendered gratuitously. . . . Failure to agree on the amount of compensation entitles the physician to the reasonable value of his services, even where he ministers treatment to a person incapable of mutuality of assent" (citations omitted)). *See also Gleason v. Charlotte-Mecklenburg Hosp. Auth.*, 284 N.C. App. 205, 873 S.E.2d 70 (2022); *Cole v. Wagner*, 197 N.C. 692, 699, 150 S.E. 339, 342 (1929).

room patients' spouses or parents, who sign no agreement with the hospital, under the doctrine of necessaries.[9]

More generally, courts applying North Carolina law have instructed that even when the plaintiff's actions are related to express contractual obligations to third parties, the plaintiff may nevertheless maintain an unjust enrichment claim against the benefited party depending on the facts and equities involved. In *Embree Constr. Group, Inc. v. Rafcor, Inc.*, 330 N.C. 487, 411 S.E.2d 916 (1992), for example, the plaintiff, a construction contractor, entered into a contract with Rafcor to supply labor and materials for the construction of a restaurant in Mecklenburg County. Separately, Rafcor entered into a construction loan agreement with defendant United Carolina Bank ("UCB"). Throughout the construction process, the plaintiff submitted applications for payment to Rafcor, which UCB paid directly to plaintiff from Rafcor's construction loan. UCB refused, however, to pay plaintiff's last two applications for payment after completion of the restaurant, even though Rafcor's loan was not yet in default. 330 N.C. at 489, 411 S.E.2d at 919. The Supreme Court held that under the circumstances the trial court erred in dismissing the plaintiff's unjust-enrichment claim, as

---

[9] *E.g., N.C. Baptist Hosps., Inc. v. Harris*, 319 N.C. 347, 349, 354 S.E.2d 471, 472 (1987) (spouse); *Alamance Cty. Hosp., Inc. v. Neighbors*, 315 N.C. 362, 370, 338 S.E.2d 87, 92 (1986) (parent).

13

follows:

> Plaintiff avers that by UCB's refusal to disburse the monies remaining in the construction loan fund, coupled with its receipt of all the security for which it bargained in the form of a completed building, UCB was unjustly enriched. We agree. As of completion of the building in March 1988, UCB had received all the security for which it had bargained with Rafcor. UCB's subsequent refusal to release the balance of the construction loan caused it to be unjustly enriched at the expense of plaintiff. . . .

> Accepting as true plaintiff's allegations that as of March 1988 it completed the project but was refused its applications for payment from the balance of the construction loan fund held by UCB, we hold plaintiff's complaint was sufficient to state a claim for relief in the form of an equitable lien based upon UCB's unjust enrichment.

330 N.C. at 495, 497, 411 S.E.2d at 922, 923. That is, the plaintiff stated an unjust enrichment claim against the bank despite the fact that the duties for which it sought to recover were performed in connection with its contractual duties to Rafcor.

Similarly, in *Metric Constructors*, *supra*, plaintiff Metric executed a contract with a limited partnership ("CELP") to build a factory. Later, CELP entered into separate loan agreements with various lenders (the "Banks"). The Banks were not parties to the construction contract, and Metric was not a party to the financing agreements. 72 F. App'x at 918. Throughout the construction process, before the Banks paid Metric's requests for progress payments, (1) the Banks' engineer would visit the site to verify that the

14

performance milestones had been met in compliance with the construction contract, and (2) the Banks would ensure that the funding conditions relating to CELP's funding agreements were satisfied. *Id.* at 919. Unbeknownst to Metric, however, after about nine months of construction the Banks determined that CELP was out of compliance with the lending agreements. The banks did not advise Metric of their concerns, but for two months continued to send their engineer to the site to certify Metric's progress. Eventually, CELP notified Metric that the Banks had ceased funding the project. *Id.* at 919-20. Metric sued the Banks for unjust enrichment, and the district court granted the Banks' motion for summary judgment.

The Fourth Circuit reversed. The Court rejected the Banks' argument that "there can be no unjust enrichment where the benefit conferred upon the defendant resulted from services rendered by the plaintiff 'in discharge of some obligation,'" *id.* at 922 (quoting *Atlantic Coast Line R.R. v. State Highway Com.,* 268 N.C. 92, 150 S.E.2d 70 (1966)), stating as follows:

> The Banks seek to use the contract between Metric and CELP as both a sword and a shield. On one hand, they argue that Metric was required to comply with all the conditions of that contract in order to make a proper claim for payment; they even imply that Metric was required to comply with conditions set out in their separate contract with CELP. On the other hand, the Banks contend that there can be no claim against them in equity because Metric had a contract with CELP. Yet it is precisely because there is no express contract between Metric and the Banks that an action for unjust enrichment is available.

15

*Id.* at 923 (citation, footnote omitted).[10]

Here, Buncombe County's obligations to provide EMS services to its citizens arise not in contract, but pursuant to State regulation. Accordingly, *Atlantic Coast Line, supra*—which involved statutory duties owed directly to the plaintiff, as opposed to third parties—is instructive here. In *Atlantic Railroad*, the State Highway Commission widened two roads in McDowell County and then ordered the plaintiff railroad to widen its crossings on those roads, invoking statutory authority. The railroad protested and filed suit. The Superior Court ruled that the Commission was statutorily authorized to require the railroad to widen its crossings and ordered it to do so. The railroad substantially complied with the Superior Court's order. Two appeals

---

[10] Defendants have abandoned the argument they made in their original briefing that the Court of Appeals' majority opinion in *Ron Medlin Const. v. Harris*, 199 N.C. App. 491, 681 S.E.2d 807 (2009), changed North Carolina law and implicitly overruled the Fourth Circuit's decision in *Metric Constructors*. They say that after the Court of Appeals' ruling in *Ron Medlin*, "a third-party contract precludes an unjust-enrichment claim in exactly the same way that a contract between the parties does." (ECF 4-1 at7 n.3). Defendants continue generally to cite the Court of Appeals' decision (ECF 8 at 5) but do not acknowledge that on appeal, the Court of Appeals' opinion was substantially narrowed by the Supreme Court and upheld on grounds with little or no relevance to the instant dispute. (*See* ECF 5 p. 13). Of course, a federal court's task in a diversity-jurisdiction case is to "apply controlling state law on settled issues and predict how *the state's highest court* would rule on unsettled issues." *Young v. Equinor USA Onshore Props.,* 982 F.3d 201, 206 (4th Cir. 2020) (emphasis added).

followed. *See* 268 N.C. 92, 94, 150 S.E.2d 70, 72 (citing *State Highway Com. v. Clinchfield R. Co.,* 260 N.C. 274, 277, 132 S.E.2d 595, 597 (1963)).

In the second appeal, the railroad argued that the Commission lacked statutory authority to require the railroad to widen the crossings and sought unjust enrichment damages for the cost of its construction work. The Supreme Court first determined that in enacting the subject statute, "[t]he Legislature clearly intended the statute to apply to the facts that exist here and to provide a remedy such as public safety, convenience and necessity might require." 268 N.C. at 95, 150 S.E.2d at 73. Hence the railroad was compelled by the Highway Commission to comply with a statutory obligation, as enforced by the superior court, and as a result was injured.

The Supreme Court first acknowledged that the equitable remedy of unjust enrichment does not lie "when the services are rendered gratuitously or *in discharge of some obligation*." 268 N.C. at 96, 150 S.E.2d at 73 (emphasis in original). Significant to the instant dispute, the Court then analyzed whether the Commission's actions in compelling the railroad to widen the crossing were just and appropriate:

> In order that the law will give redress for an act causing damage, *that act must be not only hurtful, but wrongful*. There must be *damnum et injuria*. It is a well-established maxim of the law that damage without wrong, or '*damnum absque injuria*,' does not constitute a cause of action. . . . An injury sustained in obeying a regulation within the scope of the police power, or

17

damages incurred in complying with the provisions of a statute under coercion of a degree of the highest judicial tribunal enjoining the violation thereof, must be considered '*damnum absque injuria*.' Injury resulting from a *proper* exercise of a lawful power of the sovereignty is remediless, except so far as the sovereign power gives a remedy.

268 N.C. at 96, 150 S.E.2d at 73 (emphasis added; cleaned up; citations omitted). *Atlantic Railroad* makes clear that when the actions of a plaintiff making an unjust enrichment claim (in that case, the railroad, here, Buncombe County) are governed by statute or regulation, a determination of whether the actions of the other party are "wrongful" or "proper" is nevertheless appropriate. In *Atlantic Railroad*, the actions of the Commission compelling the railroad to widen the railroad crossing were deemed proper; here, the conduct of Defendants alleged by Plaintiff is assuredly wrongful.

Defendants also contend that North Carolina courts refuse to create exceptions to general pronouncements of state law. *See* Objection pp. 6-7. Examples to the contrary are too numerous to mention but include *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991) (creating exception to Workers' Compensation Act's exclusivity provision in certain circumstances); *Coman v. Thomas Mfg. Co.*, 325 N.C. 172, 175, 381 S.E.2d 445, 447 (1989) (adopting public policy exception to the employee-at-will doctrine). But even if Defendants' assertion as to the rigidity of legal principles were correct, it must be emphasized here that we are dealing with unjust enrichment, an

18

equitable remedy, and therefore the analysis implicates "the familiar balancing process and flexible remedial resources of courts of equity." *Meiselman v. Meiselman*, 309 N.C. 279, 297, 307 S.E.2d 551, 562 (1983). Here, equity requires that Defendants be held accountable for their actions.

## CONCLUSION

Magistrate Judge Metcalf's recommendation that the Defendants motion to dismiss Plaintiff's claim for unjust enrichment be denied to the extent it is based on events that occurred after August 6, 2021 was entirely correct. This Court should adopt his Memorandum and Recommendation so that this highly meritorious action may proceed to discovery and trial.

19

Respectfully submitted this the 13th day of August, 2025.

*/s/ Robert N. Hunter, Jr.*
Robert N Hunter, Jr.
(N.C. Bar No. 5679)
John F. Bloss
(N.C. Bar No. 23947)
Higgins Benjamin, PLLC
301 N Elm Street, Suite 800
Greensboro, NC 27401
336-273-1600
Fax: 336-274-4650
rnhunterjr@greensborolaw.com
jbloss@greensborolaw.com

Mona L. Wallace
(N.C. Bar No. 09021)
John S. Hughes
(N.C. Bar No. 22126)
Olivia Smith
(N.C. Bar No. 58375)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
mwallace@wallacegraham.com
jhughes@wallacegraham.com
osmith@wallacegraham.com

*Attorneys for Plaintiff*

## Certificate of Service and of AI Use

The undersigned certifies that this document is being filed by CM-ECF which shall effectuate electronic services on all counsel of record.

The undersigned certifies that this foregoing document complies with this Court's standing order at 3:24-mc-104 because its preparation did not involve the use of prohibited artificial intelligence tools and because an attorney has personally verified its accuracy as required.

August 13, 2025.

*/s/ Robert N Hunter, Jr.*
Robert N Hunter, Jr.
(N.C. Bar No. 5679)
John Bloss
(N.C. Bar No. 23947)
Higgins Benjamin, PLLC
301 N Elm Street, Suite 800
Greensboro, NC 27401
336-273-1600
Fax: 336-274-4650
rnhunterjr@greensborolaw.com
jbloss@greensborolaw.com

*Co-counsel for Plaintiff*